## In re KIRSCHBRAUN.

### Patent Appeal No. 2504.

Court of Customs and Patent Appeals.
Dec. 1, 1930.

Charles M. Thomas and Francis D. Thomas, both of Washington, D. C., for appellant.

T. A. Hostetler, of Washington, D. C. (Howard S. Miller, of Washington, D. C., of counsel), for Commissioner of Patents.

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges.

GARRETT, Associate Judge.

This matter is before us on appeal from the Board of Appeals of the Patent Office affirming a decision of the Examiner rejecting certain claims of appellant for process and apparatus patent relating to a claimed improvement for treating hydrocarbons.

Two claims, numbered 5 and 6, respectively, were allowed. Those appealed are Nos. 12 to 18, inclusive. Nos. 17 and 18 were not before the Examiner, but were presented to the Board, which, after considering them, held them unpatentable over prior art, and declined to recommend their admission and allowance.

Claims 17 and 18 may be taken as illustrative of both the process and apparatus applications:

"17. In the art of converting heavy into lighter oils wherein a stream of oil is continuously advanced through a heating coil to be heated to a cracking temperature and then transferred to a reaction zone where conversion occurs, the improvements consisting in controlling the amount of heat applied to the oil stream in transit through the heating zone, in regulating the temperature to which the oil is raised in response to variations in the transfer temperature of the oil by varying the ratio between the heat provided and the volume of oil advancing through the heating zone during a given period of time to maintain said oil stream as it is continuously transferred to the reaction zone at a substantially predetermined temperature.

"18. In an apparatus for converting heavy into lighter oils, the combination with a furnace having a heating zone, of a heating coil disposed therein, means for continuously advancing a stream of oil through said coil, a reaction zone, means for controlling the temperature imparted to the oil passing through said zone by varying the ratio between the heat provided and the volume of oil passing through said coil in a given period of time, thermal responsive regulatory means acting in response to variations in the temperature of the heated oil in the coil for regulating said controlling means to maintain the oil stream as it is being transferred to the reaction zone at a substantially uniform temperature."

It is appellant's contention that his claimed invention constitutes a novel and

valuable contribution to the art of oil cracking, in that he discovered the cause of, and furnished a workable remedy for, the accumulation of carbon in the tube and drum system, which accumulation had, before appellant's device and process came into use, caused very frequent and irregular closings down of the cracking mechanisms in order to clean them for operation.

In the conventional type of tube and drum installation, the crude oil is pumped into a coil of tubes, referred to in appellant's diagram as "heating tubes." In its passage through these tubes, the oil is heated to a temperature of approximately 800 degrees Fahrenheit. At this temperature the "cracking" process, which is a breaking up of the crude oil, is partially consummated. From the heating tubes the material passes through a "transfer line" into an "enlarged, insulated and unheated reaction chamber." In this reaction chamber the cracking, or breaking up, process continues. The lighter elements, practically in the form of vapor, pass out through a pipe, projecting from the top of the vapor chamber, into a condenser chamber. The heavier elements fall to the bottom of the "vapor chamber" and are withdrawn, as residuum, through a line, or tube, projecting from the bottom of the chamber.

The discovery of applicant, which it is claimed resulted after long study and experimentation, was that the difference of a very few degrees in the temperature of the oil at the point where it leaves the heating tubes causes vaporization and "consequent precipitation of carbon." His remedy was to maintain the temperature of the liquid at the point of its transfer from the heating tubes to the vapor chamber—that is, in the transfer pipe—within very narrow, predetermined limits of variation.

To accomplish this, applicant devised an instrumentality consisting of the interposition of a pyrometer in the transfer line which controls the thermostatically operated rotary motor that operates the pump whereby the crude material is driven into the heating tubes. As the temperature of the liquid in the transfer pipe begins to fluctuate, the thermostatical arrangement responds. When the temperature of the liquid rises above the predetermined number of degrees, the speed of the motor is automatically increased with a consequent increase in the amount of cool, fresh oil fed into the heating tubes. On the other hand, when the liquid in the transfer pipe becomes too cool, the speed of the motor is automatically retarded and less of the raw material is fed. By this means an approximate equilibrium of temperature is automatically maintained in the liquid in its passage from the heating tubes to the vapor chamber.

The claims which were allowed by the Examiner covered the process and apparatus whereby this equilibrium was maintained by regulating the flow of the cool oil into the heating tubes. In other words, as we understand it, applicant was allowed claims that covered the process and mechanism which respond to that portion of claim 17, reading:

" * * * The improvements consisting in controlling the amount of heat applied to the oil stream in transit through the heating zone."

But he was denied that portion of the claim which describes an alternative plan, reading (in claim 17):

" * * * In regulating the temperature to which the oil is raised in response to variations in the transfer temperature of the oil by varying the ratio between the heat provided and the volume of oil advancing through the heating zone during a given period of time to maintain said oil stream as it is continuously transferred to the reaction zone at a substantially predetermined temperature."

The examiner who allowed the granted claims rejected the others, principally upon the ground that the latter are broader than appellant's specific disclosure and, therefore unpatentable.

The Board of Appeals disagreed with this view, saying:

"It is obvious that the heat imparted to the oil in the coils 2 might be varied either by varying the rate of flow of the oil or by varying the burner. The claims on appeal are broad enough to include both ways of varying the heat input to the oil. Claims which are restricted to varying the rate of flow of oil have been allowed by the examiner.

"As stated by the appellant the temperature of the oil at that point at which it is discharged from the tubes should be maintained as nearly as possible at a selected constant value. It is more or less immaterial whether this be obtained by varying the flow of oil or by varying the supply of heating medium. The appealed claims are supported by appellant's disclosure and we believe that the rejection on the ground that they are broader than the disclosure is not warranted."

But the Board rejected the claims on prior

art as shown in patents to Seigle, Hoyt, Hopkins, Dubbs, Paris, and Fenton.

In so far as the Board disagreed with the Examiner on the question of the broadness of the disallowed claims, our view coincides with that of the Board. It seems to us that the weight of authority sustains it.

In Winans v. Denmead, 15 How. (56 U. S.) 330, 14 L. Ed. 717, it was said:

"The exclusive right to the thing patented is not secured, if the public are at liberty to make substantial copies of it, varying its form or proportions. And, therefore, the patentee, having described his invention, and shown its principles, and claimed it in that form which most perfectly embodies it, is, in contemplation of law, deemed to claim every form in which his invention may be copied, unless he manifests an intention to disclaim some of those forms."

In Continental Paper Bag Co. v. Eastern Paper Bag Co., 210 U. S. 405, 418, 28 S. Ct. 748, 751, 52 L. Ed. 1122, the Supreme Court of the United States reasserted this principle, saying:

"We think it is clear that the court considered that Liddell sought to comply with § 4888 of the Revised Statutes. * * * In other words, he filed a description of his invention, explained its principle, and the best mode in which he 'contemplated applying that principle,' and did not intend to give up all other modes of application. An inventor must describe what he conceives to be the best mode, but he is not confined to that. If this were not so, most patents would be of little worth.

" 'The principle of the invention is a unit, and invariable the modes of its embodiment in a concrete invention may be numerous and in appearance very different from each other.' 2 Robinson, Patents, § 485."

Other cases applying the principle in point are Western Electric Mfg. Co. v. Larue, 139 U. S. 601, 606, 11 S. Ct. 670, 35 L. Ed. 294, Ryder v. Townsend (C. C.) 188 F. 792, 807, and International Banding Machine Co. v. American Bander Co. (C. C. A.) 9 F.(2d) 606. In this latter case the Circuit Court of Appeals of the Second Circuit at page 608 of 9 F.(2d) said:

"It is the duty of the court to read a claim in the light of the entire disclosure of the patent as a whole. It will interpret an expression positively recited in the claim as satisfied by any suitable instrumentality capable of performing the stated function successfully, unless, by so doing, violence to some other patent may be committed. It should never interpret a positively recited generic expression as limited to the precise instrumentality disclosed by the patent, except where such narrow interpretation is necessary to distinguish the claim from the prior art."

Each of the foregoing cases contains applicable citations.

The law relating to equivalents has been interpreted in the Continental Paper Bag Co. Case, supra; Lourie Implement Co. v. Lenhart (C. C. A.) 130 F. 122, 129; National Hollow Brake-Beam Co. et al. v. Interchangeable Brake-Beam Co. (C. C. A.) 106 F. 693; Kinloch Tel. Co. et al. v. Western Electric Co. (C. C. A.) 113 F. 652; and in numerous other cases referred to in these decisions.

In the instant case we think it obvious that appellant's specifications and description entitle him not only to the allowed claim, wherein the oil temperature is regulated by controlling the amount of cool oil fed into the heating tubes, but also the claim, as limited in the application, which, as we understand, is for process and apparatus that will produce the same result by partly regulating the temperature of the oil prior to its injection into the tubes.

The invention lies largely in keeping the temperature of the oil within narrow limits of variation as it passes through the transfer line, and whatever new and patentable means applicant has disclosed for doing this, we think, he may claim.

If, therefore, the granted claims were allowable over the prior art, we can see no reason for rejecting the other claims.

The patentability of the allowed claims is not before us. For the purpose of this issue we assume, of course, that they were correctly allowed by the Examiner, who was the technical expert in the consideration of the application.

The familiar rule that any doubt which exists should be resolved in favor of the applicant is here applicable.

The decision of the Board of Appeals is reversed, and the appealed claims allowed.

Reversed.