**HUNTMAN STABILIZER CORPORATION v. GENERAL MOTORS CORPORATION (two cases).**

Nos. 8560, 8566.

Circuit Court of Appeals, Third Circuit.

Argued May 2, 1944.

Decided Aug. 31, 1944.

Rehearing Denied Sept. 26, 1944.

Writ of Certiorari Denied Dec. 4, 1944.

See 65 S.Ct. 271.

Benjamin T. Rauber, of New York City (Leonard G. Brown, of Orange, N. J., on the brief), for Huntman Stabilizer Corp.

Drury W. Cooper, of New York City, (Drury W. Cooper, Jr., of New York City, on the brief), for General Motors Corp.

Before JONES and GOODRICH, Circuit Judges and GANEY, District Judge.

GOODRICH, Circuit Judge.

The plaintiff, Huntman Stabilizer Corporation (herein called Huntman) sued the defendant, General Motors Corporation (herein called General Motors) for patent infringement. Six patents were originally involved, four are now before us.[1] The District Judge upheld the validity of the patents as follows:

1,971,957, claims 1, 2, 3 and 4; . . ·
1,971,958, claims 1 and 2;
1,971,959, claims 1 and 2;
1,971,960, claim 6.

He found the plaintiff's patents infringed by the defendant's structure which was designated by the parties as the Oldsmobile type, but found proof of infringement lacking in case of two other structures also manufactured by the defendant, known as the Buick and Chevrolet types. The plaintiff has appealed because of the failure to hold that all three types of structure infringed; the defendant appeals on the ground that it should not be held liable at all.

The patents involved are in the general field of those which provide safety and comfort for occupants of road driven vehicles. It is a field in which many have sown and garnered. The particular problems involved in Huntman's patents and the defendant's structure are describable in non-technical language. If a vehicle has stiff springs, like the early automobile or a jeep, there is little yielding when a wheel hits an obstacle or depression in the road. The impact is transferred to the contents, passenger or freight, of the vehicle. If only one wheel is hit, that corner of the vehicle is raised, the floor tips. If softer springs are used, they respond to the road shock and take a measure of it from the occupants of the car. But if an obstacle is hit, especially at high speed, there is danger that the recoil may break the spring. In any event, the sudden depression and expansion of the spring will bounce the passengers badly even though they are relieved of the jar of the first impact. It is apparent that there are two objects to be attained in order to secure riding comfort and safety. One is a means for permitting a gradual recoil of springs to avoid bounce. The other is a way to distribute a shock received by one wheel or the wheels on one side of a vehicle between the two sides to keep it level and prevent roll. Huntman claims, in the words of his counsel, to have been "the first to invent the combination of a pair of recoil-check or snubber shock absorbers and a connecting means to distribute and equalize the shocks between them and to permit equally the more gradual recoil of the springs."

The plaintiff does not claim to be the inventor either of the shock absorbers or the connecting means. Shock absorbers were well known in 1925 when the first of the patents here involved was applied for, and, as every car owner knows, are standard equipment today.

A connecting means for equalizing the strain upon springs of vehicles was patented in 1882 by Francis Ezell, No. 260,960. His patent was for a combination of a transverse shaft and springs whereby the play or stroke of the springs would be regulated, and the pair of springs would move in unison at all times and under all stages so that if a wagon were loaded unevenly or the pressure were greater on one side than on the other, both springs would be affected equally through the connecting shaft and the wagon bed would be evenly depressed on both sides. This device was also aimed at preventing "the springs from breaking when expanding in suddenly unloading the wagon (by dumping its load, for example) or from the reaction of the spring when the vehicle [passed] * * * over ruts in the ground, thus operating as a brace to strengthen the several connecting parts."

---

[1] Two others numbered 2,089,263 and 2,107,183, are removed from the case by plaintiff's disclaimer.

Obviously, unlike plaintiff's patents, this one does not include shock absorbers and hence there is no gradual dampening or check of the recoil. But these are differences peculiar to shock absorbers and not to plaintiff's claimed invention. The distribution is present, though it is true that the regulation is of the stroke of the springs rather than of the gradual dampening and check of the recoil.

■■ The general propositions of law applicable to combination patents are not difficult either to state or to understand. A combination is a union of elements, some of which may be old and others new or all old or all new. It is the combination which is the invention. Leeds & Catlin Co. v. Victor Talking Machine Co., 1909, 213 U.S. 301, 29 S.Ct. 495, 53 L.Ed. 805. But the result must be the combination and not a mere aggregation of several results, each the complete product of one of the combined elements. It must be the product of the coacting influences of the various elements and which is produced by their union. Hartman Furniture & Carpet Co. v. Banning, 7 Cir., 1932, 59 F.2d 129, certiorari denied 1932, 287 U.S. 659, 53 S.Ct. 121, 77 L.Ed. 560. A number of old parts or elements which, in the aggregation, perform or produce no new or different function or operation than that theretofore performed or produced by them is not patentable invention. Lincoln Engineering Co. v. Stewart-Warner Corp., 1938, 303 U.S. 545, 58 S.Ct. 662, 82 L.Ed. 1008; Toledo Pressed Steel Co. v. Standard Parts, Inc., 1939, 307 U.S. 350, 59 S.Ct. 897, 83 L.Ed. 1334; Detroit Stoker Co. v. Brownell Co., 6 Cir., 1937, 89 F.2d 422; General Machinery Corporation v. Clearing Mach. Corporation, 7 Cir., 1938, 99 F.2d 20. Cf. Prosperity Co., Inc., v. American Machine & Metals, Inc., 3 Cir., 1944, 142 F.2d 800.

Like many other rules, it is easier to state than to apply. Such application will be attempted later. But first the plaintiff's patents must be examined. No. 1,971,957 is the first in order. It was applied for in 1925, granted August 28, 1934. The next in order is 1,971,958, applied for May 1, 1934. It claims the process for which '957 claims the apparatus.

Patent No. 1,971,957 describes a combination of hydraulic or recoil check type shock absorbers[2] on each side of an automobile interconnected by a pair of tubes or cross pipes. The shock absorbers each comprise a horizontal cylindrical casing mounted on the chassis or frame and having a shaft rotatably mounted in the axis of the cylinder and having a rotating vane or piston rigidly fixed to the shaft so that as the shaft rocks it carries with it the vane or piston. The lower part of the cylinder is provided with a fixed partition secured to the casing and dividing the casing into two compartments, 2 and 3. The rotating shaft is extended through an opening in one wall of the casing and has fixed on the projecting end an arm connected by an adjustable link to the spring at a point immediately adjacent to the axle near one wheel. As this wheel rises relative to the chassis or frame it rotates the arm counterclockwise and with it the vane or piston. As the vane rotates counter-clockwise toward the lower partition it expels liquid from the chamber 2 through the cross-pipe forcing it into chamber 3 of the opposite shock absorber. The liquid thus forced into the chamber 3 of the opposite shock absorber forces the piston or vane of that shock absorber to the left expelling liquid from the corresponding chamber 2 back through the return cross-pipe into the chamber 3 of the first shock absorber. When the force is released which has lifted one wheel, and thereby lifted the arm, the recoil of the spring tends to lower the arm. However the rebound of the spring is checked by means of a check valve in the cross-pipe leading from chamber 3 and offers a frictional resistance to the return of the hydraulic fluid, thus checking the too sudden rebound of the spring. Inasmuch as the two shock absorbers are interconnected this rebound is also evenly distributed between the two. The first four claims of this patent are involved here.

Claim 1 which is typical defines the invention as " * * * means for substantially equalizing the vertical displacement shock on the wheel of one side of the vehicle with respect to the opposite side of the vehicle, comprising [1] means freely transmitting the force of vertical displacement on one side to the opposite side, [2] spring suspension means on each side responsive to the wheel displacement relative to the vehicle cooperating with said means for freely transmitting the force from side-to-side, and [3] means for thereafter more gradually permitting the return reactive force of the spring suspension means."

---

[2] The shock absorber described is the Hondaille type, well known before Huntman.

Plaintiff explains that No. 1 is the cross-connection, No. 2 is the spring and No. 3 is the recoil check shock absorber.

Claim 2 defines the invention as "a stabilizer for wheeled running gear to counteract the rocking tendency of bodies or loads spring-supported above the road wheel axles * * *."

Claim 3 defines the invention as "* * * an equalizing mechanism for spring shock displacements on the opposite sides of the vehicle * * *."

Claim 4 is for "a device for equalizing a substantially vertical displacing shock on the wheel on one side of a vehicle running gear having spring suspension between the unsprung running gear and the vehicle body or frame * * *."

■ It was this device that Huntman first installed upon a car and which was submitted to the defendant for experiment. The report given Huntman was unfavorable. It had an idea behind it, that of using the shock absorber to act as a stabilizer laterally as well as to dampen spring recoil vertically. Whether, with the tubing interconnection going under the pan, it was practical we do not pretend to know. The defendant's structures make no use of an interconnection of shock absorbers by oil bearing tubes. Patents '957 and '958 disappear from the picture therefore unless the plaintiff is right in his contention that the claims therein support the granting of the two subsequent patents as part of the field preempted in the '957 application.

Patents 1,971,959 and 1,971,960 were applied for in May, 1934 after the defendant's structures which are charged to infringe came out on the market. '959 is said in the application to be "another embodiment of the invention broadly set forth and claimed by me" in '957, and '960 was said to be "a form of development I have made and tested, relating to the invention set forth in my copending application filed August 24, 1925." They provide, for the first time in plaintiff's series of patents, for mechanical connection between the shock absorbers instead of the hydraulic connection specified in '957.

Patent No. 1,971,959 provides for a mechanical cross bar connection. Snubber type shock absorbers or dampening mechanisms on opposite sides of the frame or chassis, have their connecting straps secured close to the springs immediately adjacent to the end of the axle. A rotating transverse bar or "torque bar" mounted at its ends to sills of the frame or chassis has arms at its ends which are connected by links to the springs immediately adjacent to the axle near the connections thereto of the snubbers. When the axle is thrown up toward the frame by road shock or other force, the shock absorbers offer practically no resistance, but on the downstroke of the wheel they come into play by checking it and causing it to go down slowly. Upon recoil of the spring such checking or snubbing action of one shock absorber is transmitted and equalized through the connecting links, arms and torque bar to the opposite end of the axle and the opposing shock absorber, permitting the two shock absorbers to act together. It is to be noted that in this patent, connection existing between the shock absorbers is indirect.

Patent No. 1,971,960 discloses hydraulic recoil check shock absorbers, similar to those of patent No. 1,971,957 except that they are here connected by a shaft or torque bar extending between the shafts of the shock absorbers instead of by hydraulic connecting means. The check valve appearing in the connecting pipes in the earlier patent, is in the moving vane or piston of each shock absorber to connect directly the hydraulic compartments on opposite sides of the vane. Consequently a shock transmitted through the one shock absorber is transmitted then through the shaft to the shock absorber on the opposite side. And upon recoil of the spring both shock absorbers dampen the recoil equally, since the recoil is equalized through the connecting shaft or torque bar. Claim 6 of this patent is relied on.

■ Can these patents be fairly called an embodiment of the invention claimed in '957? We think not. It is true that the statute, 35 U.S.C.A. § 33, requiring the patent applicant to explain the principle of his invention "and the best mode in which he has contemplated applying that principle" requires the inventor to describe what he considers the best mode, but does not confine him to that mode. In re Vickers, C.C.P.A, 1944, 141 F.2d 522; cases cited in Re Kirschbraun, 1930, 44 F.2d 675, 677, 18 C.C.P.A., Patents, 735.

■ Nonetheless even though the scope of an invention is determinable from the patent claims, Continental Paper Bag Co. v. Eastern Paper Bag Co., 1908, 210 U.S. 405, 28 S.Ct. 748, 52 L.Ed. 1122, the claims are to be interpreted in the light of the specifications and drawings. Curtis Cas., Inc. v.

Master Metal Strip Service, Inc., 7 Cir., 1942, 125 F.2d 690; McRoskey v. Braun Mattress Co., 9 Cir., 1939, 107 F. 2d 143. When we apply these principles to '957 we find that although the claims encompass every equalizing mechanism for stabilizing wheeled running gear and equalizing vertical displacing shock on one side with the other, when they are read with the specifications we find what the patentee really has offered is an hydraulically connected shock absorbing combination.

■ This combination was new. As already stated, shock absorbers were old, cross bars as illustrated by Ezell, were also old. Combining shock absorbers by means of a cross bar would we think have contributed nothing new to the art, neither in mechanism nor function. But hydraulically connecting the old shock absorbers did offer some novelty. To validate '957 therefore this hydraulic connecting limitation must be read into the claim. Willett Mfg. Co. et al. v. Root Spring Scraper Co., 6 Cir., 1932, 55 F.2d 858.

■ To allow patentee now to claim every means for equalizing the strain on both sides of vehicles would allow him to extend his invention to include the prior art. This he cannot do. Schriber-Schroth Co. v. Cleveland Trust Co. et al., 1938, 305 U.S. 47, 59 S.Ct. 8, 83 L.Ed. 34; Mason Corporation et al. v. Halliburton et al., 10 Cir., 1941, 118 F.2d 729. Nor may a patentee employ claims so broad as to prevent future possible inventions. In re Smellie, 1940, 111 F.2d 651, 27 C.C.P.A., Patents, 1176. To read the claims without the limiting specifications would result in monopolizing for the patentee the entire field of the problem. The claims in '957 clearly go beyond the actual disclosure in view of the prior art, Thompson et al. v. Westinghouse Electric & Mfg. Co. et al., 2 Cir., 1940, 116 F.2d 422; Carl Braun, Inc., v. Kendall-Lamar Corporation, 2 Cir., 1941, 116 F.2d 663.

■ The conclusion is that patents '959 and '960 cannot be treated as simply an embodiment of the invention claimed in '957, but must stand on their own feet. Upon the basis of that conclusion, the patents are open to attack on many grounds. One of them is anticipation.

The Ezell patent has already been mentioned. It did not mention shock absorbers in connection with its torsion bar, for they were unknown in Ezell's day. But that is not true of Goyne.

On January 5, 1926, William E. Goyne[3] received a patent for which he had applied February 10, 1921. This patent provides for main springs in the form of semi-elliptical leaf springs (the type then in common use) connected to their corresponding side frames and to each end of the axle near the corresponding wheel and near a block attached to which is a member containing a recess within which the end of a resilient arm made up of a number of leaves as the main springs is closely but slidably fitted so that it may move longitudinally within the recess but is restrained from transverse movement. The other end of the spring arm is fastened to a shaft extending transversely of the vehicle and connected so as to prevent its longitudinal movement.

In addition the patentee states "the invention may also be embodied in other forms of mechanism * * * and may be employed in connection with the various shock absorbing devices now in general use by connecting movable parts of the devices to members which will control and absorb the shocks by distributing them to other parts of the vehicle than those immediately affected." Here we clearly have anticipation of plaintiff's invention. True Goyne does not specifically state the type shock absorber that is to be used. But the recoil check shock absorber plaintiff specifies was one of those in general use at the time when Goyne applied for his patent. It is true that Goyne's patent deals with a double spring device whose absorption of shock is a normal absorption of shock by springs as they are compressed. But it also provides for transfer of shock from one side of the vehicle to the other to be released on recoil. With the shock absorbers connected we cannot see how Goyne's patent is any different from plaintiff's.

Another short and conclusive answer on this phase of the case is that patents '959 and '960 were not applied for until after the defendant had announced the appearance of the accused structures in motor vehicles it was manufacturing for the current season. The patents applied for at that time clearly cannot be sustained unless they are to be classed as further embodiments of the earlier application '957. This, as discussed above, we have negatived.

The defendant has referred us to many

---

[3]Patent No. 1,568,551, Defendant's Exhibit D-6 D. App. 257a–263a.

other patents and publications in technical journals and motor car advertisements. We need not discuss these in detail nor pass upon questions of whether a particular one was, or was not, admissible in evidence. The sum total of their effect is to show that the problem Huntman worked on was one which, as anyone who has ever ridden in a motor vehicle knows, a common one to motor car manufacturers. These various devices and publications show how the various manufacturers were endeavoring to meet the problem. We need not, in view of the above discussion, prolong this opinion by a consideration of whether more of these devices anticipated Huntman. Nor need we go into the question of laches for what has already been said disposes of the case.

Our conclusion is that patents '957 and '958 are not infringed by the defendant's structures. Patents '959 and '960 are invalid because anticipated. The judgment of the District Court in No. 8566, the plaintiff's appeal, is affirmed. The judgment in No. 8560, the defendant's appeal, is reversed and the case remanded to the District Court with directions to enter judgment for the defendant.