DEVEX CORPORATION et al., Plaintiffs,

v.

GENERAL MOTORS CORPORATION, Defendant.

Civ. A. No. 3058.

United States District Court, D. Delaware.

Aug. 22, 1980.

---

David F. Anderson of Potter, Anderson & Corroon, Wilmington, Del., for plaintiffs; Frederick B. Ziesenheim and Lynn J. Alstadt of Blenko, Buell, Ziesenheim & Beck, Pittsburgh, Pa., Sidney Bender and Aaron Lewittes of Leventritt, Lewittes & Bender, New York City, William C. McCoy, Jr. of Pearne, Gordon, Sessions, McCoy & Granger, Cleveland, Ohio, of counsel.

Arthur G. Connolly, Sr. and Harold Pezzner of Connolly, Bove & Lodge, Wilmington, Del., for defendant; George E. Frost, William A. Schuetz and Saul Schwartz of General Motors Corporation, Detroit, Mich., of counsel.

Bruce M. Stargatt of Young, Conaway, Stargatt & Taylor, Wilmington, Del., Special Master.

## OPINION

CALEB M. WRIGHT, Senior District Judge.

Devex Corporation ("Devex") seeks more than $100 million actual damages, plus punitive damages, interest, attorneys' fees and costs for infringement by General Motors Corporation ("G.M.") of Claim 4 of Devex's patent [1] for a process to pressure–form metal objects.

This case began in 1956–57 when Devex sued G.M. and Houdaille Industries, Inc. in the Northern District of Illinois. In 1962, Judge Edwin A. Robson ruled that Claim 4 of Devex's patent was invalid.[2] A year later, however, the Seventh Circuit Court of Appeals reversed and held that Claim 4 was valid.[3] The Supreme Court denied G.M.'s

---

1. Reissue Patent No. 24,017 issued to Devex's assignee John A. Hendricks on June 7, 1955, on Original Patent No. 2,588,234, dated March 4, 1952, based on an October 31, 1950 application.

2. Principal Documents on Accounting, No. 2.

3. *Devex Corp. v. General Motors Corp.*, 321 F.2d 234 (7th Cir. 1962).

motion for review.[4] G.M. and Devex then moved their dispute here. Following trial, this Court found that three of G.M.'s accused practices did not infringe Claim 4,[5] a finding that the Third Circuit Court of Appeals reversed on appeal.[6]

This Court subsequently appointed a Special Master, Bruce M. Stargatt, Esquire, who worked hard, long and well to determine which of G.M.'s other accused practices infringed Claim 4 and to set a reasonable royalty that G.M. should pay for its infringement. With the Master's guidance, the parties took dozens of depositions, propounded and answered hundreds of interrogatories and produced thousands of documents. A hearing followed, consuming fifty-three days between October 30, 1978 and February 14, 1979. Following briefing and argument, the Master released his report on February 7, 1980. Presently before this Court are the parties' Exceptions to the Report of the Special Master.

### THE INVOLVED PROCESS

Claim 4 covers:

The process of working ferrous metal which comprises forming on the surface of the metal a phosphate coating and superimposing thereon a fixed film of a composition comprising a solid meltable organic binding material containing distrubted there through a solid inorganic compound meltable at a temperature below the melting point of the ferrous metal phosphate of said coating and having a hardness not exceeding 5 on the Mohs' hardness scale, and thereafter deforming the metal.

As the Master noted: "The 'organic binding material' contemplated by the patent is soap. The 'inorganic compound' is borax, or some other inorganic substance meeting the patent's claims and performing the same function as does the borax."[7]

The happy result of this process is that phosphate, soap and borax work to lubricate the pressure-forming operation, preventing harmful contact between the metal products and the machinery with which they are formed. Although other lubricants may be used, the phosphate, soap and borax combination is especially beneficial because it may be easily cleaned from the metal product following its formation.

### THE MASTER'S FINDINGS

The Master first found that, from among G.M.'s approximately sixty allegedly infringing practices, practices 4–5, 7, 9, 12–13, 16–17, 22, 25 (in part), 26–28, 30–31, 36–38, 42, 47–49, 51, 54 and 56 all clearly infringed Devex's patent. In addition, the Master found that chemicals tetrapotassium pyrophosphate (TKPP) and trisodium phosphate (TSP) were borax equivalents. Thus, the Master found that the use of phosphate, TKPP and soap in accused practices 6, 14, 50 and 52 infringed Claim 4. He found that the remaining practices did not infringe Claim 4 for a variety of reasons. First, the Master held that Claim 4 included a requirement that products be cleaned following their formation. Because accused practices 2, 3, 10, 11, 15, 19–21, 25 (in part), 33–35, 39–41 and 44–45 included little or no cleaning, he found that these processes did not infringe. Second, the Master held that Claim 4 included a requirement that borax be used as a lubricant and/or as a cleaning agent. Because Devex failed to show that borax was used for either of these purposes in accused practices 1, 2, 8, 18, 20, 23–24, 29 (in part), 32, 34–35, 39, 43, 55 and 57–58, he found them to be non–infringing. Finally, the Master rejected accused practice 1 (after 1963), 8 and 46 because Devex failed to show that these processes in any way involved the use of borax or its equivalents.

The Master next assessed damages for the infringing practices. In many of these practices, including 4–6, 12–14, 36 and 48–

---

**4.** *Devex Corp. v. General Motors Corp.*, 375 U.S. 971, 84 S.Ct. 490, 11 L.Ed.2d 418 (1964).

**5.** *Devex Corp. v. General Motors Corp.*, 316 F.Supp. 1376 (D.Del.1970).

**6.** *Devex Corp. v. General Motors Corp.*, 467 F.2d 257 (3d Cir. 1972).

**7.** Report of Special Master (hereinafter "Master's Report"), p. 7.

53, G.M. manufactured bumper parts. In setting royalties for these practices, the Master first noted Devex's industry–wide offer, made soon after the Supreme Court declined to review the Seventh Circuit's determination that Claim 4 was valid, to license in return for a royalty of 0.75% of the value of the products manufactured by the use of Claim 4. Although the parties failed to present direct evidence regarding the value of G.M.'s bumpers in the mounted–on–the–car form in which they were usually sold, Devex did present evidence of the price at which G.M. sold its bumpers as parts. Devex's experts next argued, and the Master found, that bumpers on their mounted–on–the–car form should be valued at about 48% of the price at which G.M. sold them as parts. The Master, thus, calculated that the value of the approximately 130 million bumper parts formed by using the process of Claim 4 totalled about $1.15 billion. Multiplying this figure by 0.75%, the Master found that the price of Devex's 1964 offer totalled $8,607,183.70. The Master then found that through subsequent negotiations, the parties would have reduced this figure by one–third, to about $5.7 million.

The Master further found that G.M. would have agreed to pay interest at a composite corporate bond rate for the use of the royalty monies over the many years since its initial infringement.[8] Accordingly, the Master increased his assessment by about $6.5 million, arriving at a total figure of about $12.2 million, as damages for G.M.'s use of the Claim 4 process to manufacture bumpers.

G.M. also used the infringing process to manufacture other products besides bumpers. The Master, however, ruled that Devex failed to adduce sufficiently reliable evidence regarding a reasonable royalty for the manufacture of these products. Therefore, the Master found that Devex was not entitled to recover anything for G.M.'s use of the Claim 4 process to manufacture products other than bumpers.

The Master refused to award multiple damages, or attorneys' fees, finding that G.M.'s infringement was insufficiently aggravated.

### PLAINTIFFS' OBJECTIONS TO THE MASTER'S FINDINGS [9]

■ Devex first seeks to widen the scope of infringing processes to include processes in which metal was treated with phosphate, soap and borax and pressure–formed, although the process did not include any cleaning operation. Devex argues that Claim 4 does not require cleaning. Rather, Devex argues the fact that metal products may be easily cleaned following their formation was an incidental benefit. Devex further argues that the "user of a patented invention does not avoid infringement by failing to utilize all the benefits of the invention." [10]

Plaintiffs' argument misinterprets the import of the earlier decisions in this and related cases, holding that Claim 4 requires cleaning as an integral step of its process. The Court particularly notes the Seventh Circuit's July 12, 1967 decision in *Devex Corp. v. Houdaille Corp.*, 382 F.2d 17. That case is especially relevant, even though De-

---

8. For the actual method of computation, which the Court hereby approves, *see* Master's Report, p. 153.

9. In considering the parties' objections, the Court is particularly mindful of the presumption of validity normally attaching to a Master's factual findings. Unless such findings are shown to be clearly erroneous, they must be accepted. Federal Rules of Civil Procedure 53(e)(2); *W. L. Gore & Associates, Inc. v. Carlisle Corp.*, 198 U.S.P.Q. 353 (D.Del.1978). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the

definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). Of course, the "clearly erroneous" standard does not apply to the Master's legal conclusions which "have no effect except to the extent they are correct propositions of law." 5A J. Moore, Federal Practice ¶ 53.12[5] (2d Ed. 1980).

10. Brief In Support Of Plaintiffs' Exceptions to The Special Master's Report (hereinafter "Plaintiffs' Brief"), p. 181.

vex and G.M. had previously moved their dispute from the Seventh Circuit, because it interprets the Seventh Circuit's 1963 decision rendered while the dispute between G.M. and Devex was still before that Court. The background to the 1967 case is that, in 1965, Judge Robson granted summary judgment in favor of Devex on the issue of infringement. The lynchpin of Judge Robson's decision, reported at 148 U.S.P.Q. 74, was that Claim 4 should be literally interpreted. Although Claim 4 was and is very broad, Judge Robson refused to "read into the claim a requirement" that would limit its scope. *Id.*, p. 77.

On appeal, the Seventh Circuit held that their 1963 "decision requires that the claim in suit be given a narrow and restricted construction."[11] The Seventh Circuit Panel then reviewed the setting for its prior decision:

> [I]t was conceded that all of the elements of the claim were old in the art, but plaintiffs sought to uphold validity upon the basis that such elements "were put together in a new way and achieved a new and unexpected result." It was solely on this basis that this Court sustained validity and reversed the District Court.
>
> .    .    .    .    .
>
> Thus, having obtained a decision of validity on a narrow and restricted basis, they now contend, inconsistently we think, that the claim must be applied literally to defendant's alleged infringing process. Such a construction would monopolize the whole broad field of metal forming with any use of a dry soap and borax over phosphate at any temperature or pressure, regardless of the results.[12]

Clearly, then, the Seventh Circuit contemplated that Claim 4 should be afforded a more limited interpretation than its literal

reading might otherwise suggest. The Third Circuit expressly recognized the applicability of the Seventh Circuit's findings, ruling that "[C]laim 4, even as restricted and held valid in the Seventh Circuit, covers and protects the combination of soap and borax  .  .  .  so that the process will yield its claimed advantages."[13]

The Seventh Circuit contemplated that cleaning metal products would be required as an integral part of Claim 4. Devex's patent involved a combination of well–known and often–used parts. One prior art patent disclosed the use of a phosphate coating. Another patent disclosed the use of lubricants containing soap and borax and prior art publication disclosed the use of a soap lubricant over a phosphate coating.[14]

Judge Robson's 1962 opinion recognized that a new combination of old elements may be patentable, but only if it "achieves new and surprising results, or stated differently, the whole exceeds the sum of the parts."[15] Subsequent opinions by both the Seventh and the Third Circuits repeated this test.[16] Devex's problem then was to articulate the new and surprising result of its process. To this end, Devex stressed how easily the products of its process, once formed, might be cleaned.[17] This result contrasted with the results of other processes, which, while showing an acceptably high level of lubrication, caused zinc stearate to form on and adhere to the surface of the formed product. Since zinc stearate is insoluble in water, it can be removed only through difficult, time consuming and expensive cleaning.

The primary importance of Devex's process was not that the addition of borax somehow enhanced lubricity. Rather, the addition of borax inhibited the formation of

---

11. *Devex Corp. v. Houdaille Corp.*, 382 F.2d 17, 22 (7th Cir. 1967).

12. *Id.*, pp. 22–23.

13. *Devex Corp. v. General Motors Corp.*, 467 F.2d 257, 261–62 (1972).

14. Principal Documents on Accounting, No. 2.

15. *Id.*

16. *Devex Corp. v. Houdaille Industries, Inc.*, 382 F.2d 17, 22 (7th Cir. 1967); *Devex Corp. v. General Motors Corp.*, 467 F.2d 257, 258 (3d Cir. 1972).

17. Principal Documents on Accounting, No. 2A, No. 3A.

zinc stearate resulting in products that could be easily cleaned. Devex thus relied upon the ease of cleaning to defend the validity of what would otherwise have been an overly broad claim.

Devex claims, however, that "it is clearly established that a Court may not add limitations to claims in order to make them patentable. *Graver Mfg. Co. v. Linde Co.*, 336 U.S. 271, 277 [69 S.Ct. 535, 538, 93 L.Ed. 672] (1949)." Where Claim 4 did not literally impose a requirement of cleaning, Devex argues, courts were powerless to impose one.

Devex's reliance on *Graver Mfg. Co.* is misplaced. On reargument, the Supreme Court clearly rejected "as subordinating substance to form" the rule of literalism which Devex now seeks to resurrect. Indeed, *Graver Mfg. Co.* specified a thorough review of all available interpretive aids and a number of cases have accepted this direction. Chisum, Patents § 18.04[4] (1980). *See e. g. Huntman Stabilizer Corp. v. General Motors Corp.*, 144 F.2d 963 (3d Cir. 1944). Although courts may not rewrite patent claims, they may interpret them so as to avoid a finding of invalidity.[18] Neither precedent nor logic dictate that a claim which has been narrowly construed in order to survive a validity determination should be interpreted more broadly when it comes to determining what practices violate its coverage. Accordingly, the Court accepts the Master's finding that "[p]ractices as to which little or no cleaning was required do not infringe" Claim 4.

■ Devex next attacks the Master's conclusion that practices applying borax as a rinse to phosphate coated metal and then applying soap were non-infringing. The

Master claimed that this conclusion was supported by several considerations, all of which must be rejected.

The Master first found that "there was not a shred of evidence that borax (or equivalent) rinses were employed for the purpose of enhancing either the lubricity of the work-piece, or its post-formation cleanability. Rather, the Master concluded "[T]he record as a whole demonstrates that the only purpose of the borax in the accused rinse processes was to neutralize acid carryover from the phosphate bath."[19] The Master also considered the beliefs of Devex, its assignor and G.M. regarding the purpose for using borax rinses.[20] The history of this litigation, however, shows the fallacy of considering the reason why Claim 4 specifies the use of borax. In an earlier opinion, this Court carefully reviewed involved chemical principles, considering the purpose for which Claim 4 required the use of borax. This Court then concluded that G.M. had not infringed Claim 4 because Devex had failed to demonstrate that G.M.'s purpose in using borax matched the purpose for which its use was specified in Claim 4.[21] On appeal, the Third Circuit rejected this approach, ruling: "[I]f it is directly determinable that the two lubricants have essentially the same components, are applied in the same way and that the results of their use are essentially the same, the disputation of chemists about the chemical interactions that occurred in the processes cannot be decisive."[22]

In applying this test, the Court first notes the similarity between the borax rinse processes and the other processes in which borax was used as an integral part of metal forming. In both processes, phosphated metal was dipped in a borax solution,[23]

18. *Application of Prater*, 415 F.2d 1393, 56 CCPA 1381 (1969); *Huntman Stabilizer Corp. v. General Motors Corp.*, 144 F.2d 963 (3d Cir. 1944).

19. Master's Report, p. 46.

20. *Id.*, pp. 48–51.

21. *Devex Corp. v. General Motors Corp.*, 316 F.Supp. 1376, 1383–86 (D.Del.1970).

22. *Devex Corp. v. General Motors Corp.*, 467 F.2d 257, 261 (3d Cir. 1972).

23. G.M. might argue that the concentration of borax in the rinse solution was usually lower than the concentration in the integral borax solutions. This rule, however, was not universal. Master's Hearing Transcript, pp. 117–125. G.M. might also argue as the Master found, that Devex "offered no credible quantitative proof as to the amount of borax from the rinse

treated with soap, formed, and, in some cases, cleaned with good results. To the extent, that the borax rinse processes involve cleaning, then, they meet the Third Circuit's test of infringement. To the extent that these processes do not involve cleaning, they do not infringe Devex's patent, but only because they do not involve cleaning.

■ The Master next assumes the position that file wrapper estoppel prevents Devex from accusing the G.M. processes that involve a borax rinse. Under this doctrine, a patentee cannot later claim what the Patent Office required him to surrender in order to obtain his patent.[24] In this case, the Master found that Devex's assignor initially included an Example XXXV involving a borax rinse in his application.[25] Devex's assignor then "cancelled that example when the patent examiner required that the specification be shortened and limited to 'such parts of it as are commensurate with claims that the applicant will continue to prosecute.' "[26] The problem with this argument is that it is unclear whether the examiner's objections were aimed at Example XXXV's borax rinse or at some other procedure. Indeed, the file wrapper is silent on this issue.[27] To the extent there is any evidence on this issue it indicates that the Patent Office believed that Devex's patent covered borax rinses. Thus, the Patent Office permitted Devex's patent to issue with at least one example, Example VIII, suggesting the use of a borax rinse.

■ Devex next attacks the Master's finding that accused practices 1 (after 1963), 8 and 46 in no way involved the use of borax and so were non-infringing. This finding, however, is based entirely upon the inferences to be drawn from the disputed evidence. The Master so meticulously re-

viewed and resolved this evidentiary dispute and it would be useless to repeat his discussion here.[28] Careful scrutiny of his findings, however, shows that they are not clearly erroneous; Devex failed to adduce enough evidence to give the Court a "definite and firm conviction" that the Master made a mistake. Accordingly, the Court affirms these findings.

Devex next attacks the Master's calculation of a reasonable royalty covering G.M.'s use of the Claim 4 process to make automobile bumpers. Devex claims that the Master erred in placing so much reliance upon Devex's 1964 industry–wide offer to license Claim 4 at 0.75% of the value of the products manufactured using Claim 4. Instead, Devex argues, the Master should have used the five percent of value figure suggested by its experts.

■ The ideal patent royalty assessment would be the rate at which a "willing buyer and a willing seller" would agree in an arms–length negotiation. *Horvath v. McCord Radiator & Manufacturing Co.*, 100 F.2d 326 (6th Cir. 1938). Devex argues that it is entitled to a high royalty rate on the basis of its contention that it was very expensive to substitute other processes for that of Claim 4.

The Master, however, reached an opposite conclusion, finding that several of G.M.'s divisions regularly substituted non-infringing processes for infringing ones and *visa versa*. Thus, Oldsmobile used non-infringing practices to make almost all of the bumpers. Similarly Chevrolet relied, though less successfully, upon non–infringing processes until November, 1958, and used non–infringing processes to manufacture part of its bumper needs from 1960 to 1963 and from 1965 to 1966. Cadillac used non–infringing processes prior to 1962 and

likely retained in the coating after the lubricant bath." Master's Report, p. 45. Still, the above cited hearing testimony indicates that the borax rinse deposits were substantial. Thus, the Master "credit[ed] the testimony that at least some borax stayed on the workpiece." Master's Report, p. 45.

24. Chisum, Patents § 18.05 (1980).

25. PX–3, p. 63.

26. Master's Report, p. 48.

27. PX–3, p. 103.

28. Master's Report, pp. 53–59.

after 1968. Fisher Body used non–infringing processes prior to 1957 and after 1960. Where G.M.'s various divisions so often produced marketable cars without using Devex's process, the Court finds, as the Master did also, that G.M.'s negotiators would not have agreed to the high figure Devex now proposes.

■ Devex argues, however, that the use of its process saved G.M. at least $1.53 per bumper, or a total of some $75 million at G.M.'s Chevrolet Division alone. Although a patentee should be allowed some freedom in choosing the standard of comparison by which the savings to be derived from the use of its process may be calculated, a patentee is not free to choose any standard of comparison. Rather, his standard must be acceptable.[29] There must be some basis for believing that the alternative process on which his standard is based was a realistic alternative, and not some process the only possible value of which is to make the patentee's process appear more useful than, in fact, it is. Where Devex's $1.53 figure derives from comparing the cost of forming a bumper using an outdated process [30] which appears to have been so expensive that as early as 1950 industrial publications recommended against using it and all of G.M.'s various divisions followed this advice, the Court finds that Devex's standard of comparison is unacceptable and that its $1.53 figure is irrelevant.

Another factor militating against the high royalty Devex now seeks is the fact that Devex did not own or operate its own manufacturing plant. Devex could reap the benefit of its patent only by convincing others to use it, offering them a patent license at an acceptably low rate. For these reasons, the Court rejects Devex's very high royalty demand.

Instead, the court finds that a figure totalling 0.75% of sales is a reasonable royalty for G.M.'s infringement. Indeed, it is the very figure at which Devex voluntarily offered to license its patent in 1964. At that time, Devex was dealing from a position of strength because the Seventh Circuit had declared its patent valid and the Supreme Court had declined to review this decision. The 0.75% figure is not overly generous. *Compare Randolph Laboratories v. Specialties Development*, 213 F.2d 873 (3d Cir. 1954). Still, it is large enough to compensate Devex fully.

■ The Court recognizes that patentees must carry the burden of proving the level of royalties to which they are entitled. *W. L. Gore & Associates, Inc. v. Carlisle Corp.*, 198 U.S.P.Q. 353 (D.Del.1978). A patentee, however, need not prove its case to an unreasonable certainty. *Gordon Form Lathe Co. v. Ford Motor Co.*, 133 F.2d 487, 494 (6th Cir. 1943). Thus, where there is evidence that a patentee made a reasonable and *bona fide* licensing offer, it becomes defendant's duty to show the level by which, the offer exceeds a reasonable royalty.[31] In this case, G.M. failed to adduce a shred of reliable evidence that Devex's offer was unfair.

■ The Master found that the 0.75% figure should be reduced by one third. This finding was based upon the idea that 0.75% was only a bargaining figure from which Devex's negotiations could be expected to retreat. Royalty calculations, however, must be based upon evidence—not mere speculation. *Trio Process Corporation v. L. Goldstein's Sons, Inc.*, 533 F.2d 126 (3d Cir. 1976). Without some evidence showing that Devex would have accepted a lower royalty figure and, if so, what that lower figure might be, this reduction is improper. The Court, therefore, accepts 0.75% of sales, or $8,607,183.70, as a reasonable royalty for G.M.'s use of the Claim 4 processes for forming bumpers.

■ Devex next attacks the Master's recommendation against awarding any dam-

---

**29.** *Gordon Form Lathe Co. v. Ford Motor Co.*, 133 F.2d 487, 495 (6th Cir. 1943).

**30.** DX–A–9, Item 1, p. 251.

**31.** The rationale for reversing the burden of proof here is the same as that which is articulated by *Gordon Form Lathe Co. v. Ford Motor Co.*, 133 F.2d 487, 494–96 (6th Cir. 1943).

ages for G.M.'s use of the Claim 4 process to make non-bumper parts. Devex claims that the use of its process permitted G.M. to make substantial savings of which, Devex claims, it is entitled to 56.5%. Devex again focuses on uneconomical techniques, including machining and hot forging.[32] Devex claims that its focus is justified by the fact that G.M., in determining when to authorize the investment for equipment necessary to use the infringing process, sometimes calculated its expected savings versus the cost of continuing to use its older machining or hot-forging equipment.

Devex's argument must be rejected. Hot-forging and machining techniques are too old and inefficient to be viewed as viable alternative methods to make the kinds of non-bumper parts that G.M. used Devex's Claim 4 process for. Devex's proposed basis for comparison then is unacceptable. Devex failed both to suggest and to offer proof regarding any other means to calculate the reasonable royalties to which it is entitled. Because Devex thus failed to prove the level of damages to which it was entitled, the Master properly found that it should receive nothing. *W. L. Gore & Associates, Inc. v. Carlisle Corp.*, 198 U.S.P.Q. 353, 367 (1978).

Assuming, *arguendo*, that Devex's standard of comparison is acceptable, Devex is not automatically entitled to the damages it would claim. Rather, G.M. must be afforded an opportunity to offer alternative standards for comparison. *Gordon Form Lathe Co. v. Ford Motor Co.*, 133 F.2d 487, 496 (6th Cir. 1943). In this case, the Master painstakingly reviewed the benefits of Devex's process versus those of other non-infringing pressure forming operations. He found that G.M.'s various divisions easily substituted non-infringing processes to manufacture non-bumper parts. Apparently, then, Devex's process was of "relatively slight importance to" G.M., and for this reason the Master properly found that G.M. should not be required to pay anything for its infringement in the manufacture of non-bumper parts.

Devex next complains that the Master improperly rejected its claim for multiple damages and attorneys' fees. As the Master found, however, G.M.'s defense of this case is not characterized by the inequitable dealings normally required for the award of multiple damages under 35 U.S.C. § 284 or of attorneys' fees under 35 U.S.C. § 285. Accordingly, the Court approves the Master's determination of these issues.

## DEFENDANT'S OBJECTIONS TO THE MASTER'S FINDINGS

G.M. first argues that the Master improperly found that the Third Circuit Court of Appeals previously ruled that processes using "Bonderlube 235" infringed Devex's patent. G.M.'s argument looks to the history of this litigation. Shortly after this litigation was transferred here, this Court ruled that of the three accused practices, including one that used "Bonderlube 246" and two that used "Bonderlube 235", none were infringing. This decision was reversed on appeal in an opinion in which the reviewing Third Circuit panel focused on showing the infringing nature of the "Bonderblue 246" process. Defendant now claims that the Third Circuit panel intended to leave standing this Court's judgment that "Bonderlube 235" processes did not infringe Devex's patent Claim 4. The Court finds no support for this claim and rejects it for the reasons set forth by the Master.[33]

G.M. next seeks to narrow the scope of infringing processes, arguing that TKPP an TSP are not borax equivalents, and that TKPP's use in accused practices 6, 14, 50 and 52 does not infringe Devex's patent Claim 4. G.M. first argues that TKPP and TSP are not borax equivalents. The Master properly found, however, that they were such good equivalents that G.M. regularly substituted the use of one for another. G.M.'s main argument is that

---

32. Plaintiffs' Brief, p. 129.

33. Master's Report, pp. 9–16.

TKPP and TSP do not meet the terms of Claim 4 because they are not "meltable at a temperature below the melting point of the ferrous metal phosphate" coating. In support of its argument, G.M. claims that while ferrous metal phosphate coatings melt below 1050°C., pure TKPP melts at 1109°C. and pure TSP melts at 1340°C. G.M.'s argument suffers two weaknesses. First, it is unclear that ferrous metal phosphate coatings do not melt at some higher temperature. Moreover, it is unclear that TKPP and TSP, as they are used in the involved practices, melt at the elevated temperatures that G.M. claims. TKPP and TSP are not pure, but are mixed with phosphate and soap. As the Master found, this causes TKPP and TSP to melt at lower temperatures, far below the temperatures at which the phosphate coating melts. This finding is well supported by experiments, including several in which objects coated with phosphate and TKPP and TSP were heated to a temperature well below 1050°C. Although the TKPP and TSP melted, the phosphate coating did not. Accordingly, the Court finds that the Master's findings on these issues are not clearly erroneous.

■ G.M. next argues that the Master's royalty assessment was overly generous, suggesting that values approaching a few hundred thousand dollars might be more reasonable. G.M.'s several proposed figures derived from a 1955 assignment, a 1956–57 licensing offer, a partial assignment in 1964 and some 1968 settlements. The problem with G.M.'s argument is that these various events are insufficiently relevant to determine what the major infringer of Devex's patent should pay to use a process which was known to be validly patented. Thus, the 1955 assignment and the 1956–57 licensing offer came before it was known that Devex's patent was valid; the partial assignment in 1964 likely involved many contingencies, including the time and money that would be required to tap the patent's true value and the 1968 settlements included marginal infringers against whom it might have been uneconomical to litigate the issues of their infringement fully. G.M. finally relies upon a 1970 estate tax valuation. This Court doubts that the circumstances controlling the negotiations between IRS agents and attorneys for an estate holding an approximately one-ninth interest in a patent are sufficiently similar to those which would control the negotiations between Devex and G.M. to merit much attention. Accordingly, the Court follows the Master's lead and rejects G.M.'s proposed valuations.

■ G.M. next attacks the Master's award of pre-judgment interest to Devex. G.M.'s argument lacks merit. The purpose of this accounting is to determine the reasonable royalty for G.M.'s infringement. This royalty should approximate the actual royalty G.M. would have been paid had it been able to reach some accord with Devex. The Court calculated this royalty based on payments coinciding with G.M.'s use of Devex's patent. G.M.'s payments did not follow this schedule. Indeed, G.M. has yet to pay anything. Thus, it must now be charged a premium for the additional benefit it has enjoyed from retaining the use of the royalty money over the many years since its first infringement. To do otherwise would systematically undercompensate patentees and encourage their infringers to continue fighting lawsuits long after the disappearance of any justification for doing so for the sole purpose of gathering in generous interest money that rightfully belongs to someone else.

The Court, therefore, approves the payment of interest, and it further approves the computation of such interest at the corporate bond rate as recommended by the Master. The Master, however calculated interest on the amount of his recommended award through October 31, 1979 only. The interest calculation, thus needs to be revised to account for this Court's changes and updated to the date when, after all appeals have run their course, G.M. pays for its infringement. The Court is hopeful that the parties, modeling the Master's calculations, will be able to agree without further assistance upon Devex's due. Should they be unable to do so, the Court will call upon the Master's able assistance.

## COSTS

■ Remaining to be discussed is the division of costs, a topic which the Master did not treat. Rule 54 provides that "costs [should] be allowed as of course to the prevailing party." A prevailing party is the party which, although it might not sustain all of its claims, receives a favorable judgment.[34] Rule 54 further provides that a court may, in the exercise of sound discretion, vary this rule, but the situations in which this is done appear to be limited, involving unnecessary delay or only slight success on the part of the prevailing party, etc.[35] In this case, Devex has done no worse than fully litigate its claims achieving a large judgment in its favor. The Court, thus, sees no reason for relieving G.M., whose infringement necessitated this case, from the normal responsibilities of a wrongdoer.

G.M. asks, however, that at least a portion of the Master's fee be taxed to Devex. Costs of reference are treated as costs within the meaning of Rule 54.[36] Although courts are empowered to treat differently the payment of masters' fees and the payment of other costs,[37] the Court sees no reason for doing so here. Consequently, it will order G.M. to pay the Master's entire fee.

Any issues not addressed by this Opinion have nevertheless been considered by the Court and found to be without merit.

---

**34.** 6 J. Moore, Federal Practice, ¶ 54.70[4] (2d Ed. 1980).

**35.** 6 J. Moore, Federal Practice, ¶ 54.70[5] (2d Ed. 1980).

**36.** *Dyker Building Co. v. United States to use of Parreco*, 182 F.2d 85 (D.C.Cir.1950).

**37.** 5A J. Moore, Federal Practice, ¶ 53.04[1] (2d Ed. 1980).